IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CESAR AGUILUZ, D.O.** § | | |
| § | | **CIVIL ACTION NO.5:19-cv-1356** |
| *Plaintiff,* § | | |
| § | | **JURY DEMANDED** |
| v. § | | |
| § | | |
| **UNIVERSITY OF TEXAS HEALTH** § | | |
| **SCIENCE CENTER AT SAN ANTONIO,** § | | |
| § | | |
| *Defendant.* § | | |

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff CESAR AGUILUZ, D.O. ("Plaintiff" or "Dr. Aguiluz") files this Original Complaint against DEFENDANT UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT SAN ANTONIO ("Defendant" or "UTHSC-SA") and respectfully shows the Court the following:

### I.
### NATURE OF SUIT

This is a civil action for monetary relief for injuries sustained by Dr. Aguiluz as a result of the intentional acts and omissions of Defendant in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, as amended ("Title IX"). In November 2017, as a medical resident student and employee of UTHSC-SA, Dr. Aguiluz made reports of unwelcome sexual harassment to Defendant, which were corroborated. Dr. Aguiluz asserts claims under Title VII based on the sexually hostile work environment that was sufficiently severe or pervasive to alter his working conditions and to create an abusive working environment. Dr. Aguiluz also asserts claims under Title IX based on Defendant's official policies that created a sexually hostile environment for students at UTHSC-

SA, on Defendant's deliberate indifference and intentional discrimination against Dr. Aguiluz on the basis of his sex, and on Defendant's retaliation against Dr. Aguiluz for reporting the sexual harassment, sex discrimination, and retaliation he suffered.

## II.
## PARTIES, JURISDICTION, AND VENUE

1. At all material times related to the incidents described below, Dr. Aguiluz was a student and employee of UTHSC-SA in San Antonio, Bexar County, Texas, where he resided.

2. UTHSC-SA is a federally-funded institution of higher education located in San Antonio, Bexar County, Texas. UTHSC-SA may be served with process by serving its Chief Legal Officer, Jack C. Park, Office of Legal Affairs, MSC 7837, 7703 Floyd Curl Drive, San Antonio, Texas 78229-3900.

3. This court has original jurisdiction to hear the merits of Dr. Aguiluz's federal question claims under 28 U.S.C. §§ 1331 and 1343.

4. When Dr. Aguiluz alleges that UTHSC-SA committed any act or omission, he means that UTHSC-SA's officers, directors, trustees, principals, vice principals, agents, servants, and/or employees committed the act or omission and that the UTHSC-SA officer, director, trustee, principal, vice principal, agent, servant, and/or employee committed the act or omission in the course and scope of his or her employment with UTHSC-SA and with UTHSC-SA's full authorization, approval, and/or ratification.

5. UTHSC-SA is located in San Antonio, Texas, and a substantial portion of the acts and omissions underlying Dr. Aguiluz's claims occurred in San Antonio, Texas. Thus, venue is proper in this district and division under 28 U.S.C. § 1391.

## III.
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.     On or about October 25, 2018, Dr. Aguiluz filed Charge of Discrimination No. 451-2019-00388 (the "Charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging sex discrimination and retaliation in violation of Title VII. The Charge was filed within 300 days of the latest discriminatory act complained of by Dr. Aguiluz.

7.     On May 23, 2019, the EEOC issued a Notice of Right to Sue letter to Dr. Aguiluz, which was received on May 28, 2019. Within the 90-day period of the Notice of Right to Sue, the parties entered into a Tolling Agreement with an initial expiration date of November 1, 2019, and a subsequent Tolling Agreement Addendum that extended the tolling period until midnight on November 22, 2019. This Complaint was filed before the expiration of the tolling period, and thus meets the administrative requirement for filing suit. Thus, all conditions precedent to the institution of this lawsuit have been fulfilled, and Dr. Aguiluz has exhausted all of his administrative remedies.

## IV.
## FACTS

8.     UTHSC-SA is an educational institution with a record of not protecting its students or employees from sexual harassers and predators. For example, UTHSC-SA currently is under federal investigation for violations of Title IX relating to a complaint of sexual assault against a student. In October 2018, a former professor at UTHSC-SA was indicted by a grand jury and arrested for alleged indecency with a child under the age of 17. In April 2019, two students at UTHSC-SA's School of Dentistry filed lawsuits against UTHSCA-SA, alleging they were sexually harassed by a professor and that UTHSC-SA did not protect them from the professor's harassment and retaliation when he mounted a "smear campaign" against them and denied them

educational opportunities. UTHSC-SA's repeated inability and unwillingness to protect its students amounts to an institutional failure and official policy under Title IX.

9. In 2015, Dr. Aguiluz entered a medical residency program at UTHSC-SA to complete a prestigious fellowship in plastic and reconstructive surgery (the "Program"), overseen by Program Director Howard T. Wang, M.D. ("Dr. Wang"). In his final year of the Program (2017-2018), Dr. Aguiluz was named Chief Resident, responsible for administrative and other matters relating to his peers.

10. As a gay man, however, Dr. Aguiluz drew both the focus and the harassment of Dr. Wang almost immediately. The harassment was persistent and pervasive, occurring in some form almost every time Dr. Aguiluz was in Dr. Wang's presence. For instance, Dr. Wang would call Dr. Aguiluz late at night or in the very early morning hours to ask him inane questions. Sometimes Dr. Wang would stare at Plaintiff's chest and remark about his chest hair. At other times he would stare at Plaintiff's rear. Dr. Wang also would make comments to show Dr. Aguiluz that he noticed the slightest change in his appearance, such as commenting that it looked like he had cut his hair a quarter of an inch.

11. On one occasion when Dr. Aguiluz was with Dr. Wang in the operating room, some surgical instruments fell to the floor. When Dr. Aguiluz moved his head to look down, Dr. Wang told him he wanted him to "bend over" for him. This, and other, suggestive comments were stated in the presence of colleagues and operating staff.

12. In October 2015, Dr. Aguiluz was on rounds with Dr. Wang discussing patient care. Dr. Wang asked Dr. Aguiluz to step into the bathroom where Dr. Wang urinated in front of him. Dr. Aguiluz reported this uncomfortable encounter to Dr. Christie Bialowas, the Associate Program Director at the time. Dr. Bialowas then apparently discussed Dr. Aguiluz's complaint

with Dr. Wang. Approximately a week later, Dr. Wang confronted Dr. Aguiluz and told him the "thing in the restroom" needs to be "okay."

13.     For the rest of 2015 and throughout 2016, Dr. Wang continued to privately and publicly harass Dr. Aguiluz. One repetitive harassing behavior by Dr. Wang was to insinuate that Dr. Aguiluz was HIV positive. (Dr. Aguiluz is not HIV positive.) When Dr. Aguiluz had a cold or a respiratory infection, Dr. Wang would tell him to "up his HIV medications." Dr. Wang made such statements in the presence of other physicians, professors, peers, and staff. This harassment exhibited an animus to Dr. Aguiluz as an effeminate gay male, as HIV/AIDS was first identified in the gay community and became known as the "gay disease."

14.     Insinuating that Dr. Aguiluz was HIV-positive also constitutes professional defamation. In Texas, health care providers who perform invasive procedures are required, pursuant to state law, to undergo HIV testing. Those who have AIDS or are "seropositive" (HIV-positive) are subject to a fitness review by an ad hoc committee of the Texas Medical Association ("TMA") to determine their fitness to practice medicine. In addition, HIV-positive providers must undergo a review to determine which procedures they may not perform. Physicians who are HIV-positive must also inform their patients of this status and obtain consent from the patients to perform invasive procedures.

15.     Dr. Wang's false public "announcements" that Dr. Aguiluz was HIV-positive jeopardized Dr. Aguiluz's reputation and put his career at risk. According to a TMA Board of Councilors Current Opinion, "[w]here restrictions, limitations, modifications, or a change in health care activities are recommended [because of HIV-positive status], the ad hoc committee should do its utmost to assist the health care worker to obtain career counseling, job retraining, and financial and social support for these changes."

16. Dr. Wang made these HIV-positive insinuations in front of both UTHSC-SA management and Dr. Aguiluz's peers and colleagues. However, no one at UTHSC-SA intervened to protect Dr. Aguiluz.

17. UTHSC-SA's failure to ensure its environment was safe from sexual harassment caused Dr. Aguiluz considerable anxiety. Dr. Aguiluz knew that Dr. Wang was a well-known and powerful professor and surgeon with significant influence. Dr. Aguiluz was understandably fearful that if he lodged a complaint against Dr. Wang, the complaint would not be effective and would result in retaliation.

18. At the end of September 2017, Dr. Wang's harassment of Dr. Aguiluz escalated. On September 27, 2017, Dr. Wang requested that Dr. Aguiluz step into his office. Dr. Amita Shah, who had taken over as Associate Program Director, was present. As Dr. Aguiluz entered the office, Dr. Wang slapped his own thigh and requested that Dr. Aguiluz "come sit on [his] lap." When Dr. Aguiluz expressed mortification at the gesture, Dr. Wang erupted in laughter. He then began mocking Dr. Aguiluz about his hairstyle and asked whether he dyed his hair. This comment was one of many by Dr. Wang about Dr. Aguiluz's hairstyle and appearance.

19. Dr. Wang harassed Dr. Aguiluz nearly every Thursday during the second half of 2017 when Dr. Aguiluz attended lectures that were required for every resident in his program. The lectures were the core educational component of the Program and were supposed to be opportunities for the residents to engage with their peers and community and nationally-recognized practitioners and build a rapport through interactive and collaborative case studies. It was in these lectures that Dr. Wang would make the aforementioned HIV comments. He did so in front of the entire group of residents.

20. Despite actively attempting to dodge encounters with Dr. Wang, Dr. Aguiluz was forced to interact with him both in his coursework and in his residency training. Thus, the harassment by Dr. Wang pervaded every aspect of Dr. Aguiluz's educational and work experience at UTHSC-SA. After repeated exposure to Dr. Wang's harassment, Dr. Aguiluz began to suffer anxiety attacks for the first time in his life. He eventually sought counseling to deal with his anxiety and his fearfulness of Dr. Wang. His counselor recommended that Dr. Aguiluz see a psychiatrist who could consider the prescription of anti-anxiety medications. Because his work required maximum alertness at all times, Dr. Aguiluz declined to pursue medication.

21. When UTHSC-SA did nothing to address Dr. Wang's conduct, Dr. Aguiluz started to rearrange his life at UTHSC-SA in drastic ways to avoid Dr. Wang. He checked Dr. Wang's schedule at UTHSC-SA to avoid coming face-to-face with him. If Dr. Wang happened to be in his office with the door open, Dr. Aguiluz would not enter the common area outside his door. Dr. Aguiluz's educational goal at UTHSC-SA shrank from obtaining the most positive, complete, and rich education available to merely graduating and moving on as quickly as possible.

22. Dr. Wang's harassment also began affecting Dr. Aguiluz's work. During one surgery with a prominent San Antonio surgeon who was employed by UTHSC-SA as clinical professor of plastic surgery (the "Surgeon"), Dr. Aguiluz was anxious and uncharacteristically unfocused. The Surgeon noticed Dr. Aguiluz's lack of focus and asked him about it. Dr. Aguiluz shared with the Surgeon that he was having difficulty concentrating and performing at work because he was had been the victim of targeted sexual harassment by Dr. Wang.

23. After Dr. Aguiluz described the harassment, the Surgeon reported the offenses to Dr. Bonnie Blankmeyer, Executive Director of the Academic, Faculty and Student Ombudsperson

and ADA Compliance Office at UTHSC-SA. The Surgeon then encouraged Dr. Aguiluz to make his own report to Dr. Blankmeyer.

24. Dr. Aguiluz hesitated to make a report. He was afraid that Dr. Wang's power and reputation in a close-knit community of plastic surgeons would make any complaint against him futile. Further, Dr. Aguiluz was worried that Dr. Wang would retaliate against him to hinder his education successes and future employment possibilities.

25. After considerable soul-searching, Dr. Aguiluz met with Dr. Blankmeyer on November 6, 2017, where she outlined his reporting options. On November 7, 2017, Dr. Blankmeyer referred Dr. Aguiluz to Dr. Jacqueline Mok, the Vice President for Academic, Faculty and Student Affairs who oversaw Title VII employment issues.

26. On November 9, 2017, Dr. Wang ridiculed Dr. Aguiluz about dying his hair in front of an administrative assistant. This incident struck Dr. Aguiluz particularly hard. He was embarrassed and felt that Dr. Wang was making him the laughingstock of the hospital. Dr. Aguiluz then concluded that he needed to take formal action.

27. So, on or about November 11, 2017, Dr. Aguiluz formally reported Dr. Wang via an email to Dr. Mok. At this time, due to his anxiety and fear of retaliation, Dr. Aguiluz requested that the complaint remain anonymous, as Dr. Mok had previously explained anonymity was an option available to Dr. Aguiluz.

28. After internal consideration of the complaint, Dr. Mok forwarded the report to UTHSC-SA's Title IX Office and Dr. John Kaulfus, Title IX Director, as UTHSC-SA determined that its Title IX Office was the appropriate department to handle the complaint.

29. Dr. Kaulfus acknowledged the report on November 12, 2017.

30.     On November 14, 2017, Dr. Aguiluz reported his formal complaint directly to Dr. Kaulfus. He reiterated that he wanted the complaint to remain anonymous, explaining to Dr. Kaulfus that he felt ambushed and humiliated by Dr. Wang's bizarre and sexually inappropriate harassment, but that he was also fearful that Dr. Wang could ruin him professionally in retaliation for a formal complaint.

31.     Later in the day on November 14, 2017, Dr. Aguiluz was scheduled to be in a pediatric surgery with Dr. Shah, who had witnessed Dr. Wang's inappropriate "invitation" for Dr. Aguiluz to sit on his lap two months earlier but had done nothing. As the memories of Dr. Wang's torment bombarded him, Dr. Aguiluz had a panic attack. He then challenged Dr. Shah about why she had not intervened when she had witnessed Dr. Wang harassing him. After initially attempting to attribute Dr. Wang's harassment to "joking," Dr. Shah broke down crying and apologized to Dr. Aguiluz for not speaking up against such inappropriate behavior.

32.     After the incident involving Dr. Shah, Dr. Aguiluz determined he no longer wanted his complaint to be anonymous. He advised Dr. Kaulfus to change the status and requested immediate interim measures to protect him from Dr. Wang. Dr. Aguiluz asked that Dr. Wang be instructed to leave him alone and for the Program to provide him a new Program Director. Dr. Kaulfus promised that Dr. Wang would not be allowed to contact, call, or text Dr. Aguiluz in the future, and instructed Dr. Aguiluz to avoid any contact with Dr. Wang.

33.     Later, UTHSC-SA would summarize the allegations in Dr. Aguiluz's November 14, 2017, official complaint ("Official Complaint") as follows: "[Dr. Wang] made statements of a sexually suggestive nature and made statements referencing sexual orientation in the workplace in front of professional colleagues over the past two years of [Dr. Aguiluz's] residency."

34. On November 15, 2017, the day after he made his Official Complaint to the Title IX Office, Dr. Aguiluz volunteered to perform an evening surgery with Dr. Shah. Unbeknownst to Dr. Aguiluz, Dr. Wang decided to scrub in on the surgery. As Dr. Aguiluz was preparing to arrive at University Hospital for the surgery, Dr. Wang began calling and paging Dr. Aguiluz repeatedly, violating the Title IX no contact order against him. Dr. Aguiluz immediately sought help from Dr. Kaulfus by calling and leaving a voicemail for him with the details, but Dr. Kaulfus failed to return the call.

35. When he did not hear back from Dr. Kaulfus, Dr. Aguiluz begrudgingly called the operating room ("OR"). Dr. Wang commandeered the phone to speak to Dr. Aguiluz and he demanded that Dr. Aguiluz present himself to the OR. Dr. Aguiluz did not want to countermand Dr. Wang's order, but he also did not want to violate Dr. Kaulfus's Title IX directive by having contact with Dr. Wang. Receiving no response from Dr. Kaulfus, Dr. Aguiluz decided that he had to obey Dr. Wang.

36. Arriving in the OR, Dr. Aguiluz attempted to conduct himself in a professional manner, but he was anxious to the point of trembling. Heightening the drama, Dr. Wang launched into an immediate confrontation. He scrubbed out of the surgery, marched over to where Dr. Aguiluz was scrubbing in, and began to berate him for not appearing earlier. Dr. Aguiluz became overwhelmed with fear and asked Dr. Wang to leave him alone, but Dr. Wang would not. Eventually, Dr. Shah had to intervene to instruct Dr. Wang to stop yelling at Dr. Aguiluz. Dr. Aguiluz took that opportunity to get away from Dr. Wang by fleeing from the OR.

37. But Dr. Wang was not through unloading his retaliatory anger on Dr. Aguiluz. He called Dr. Bialowas and several other residents that night to attempt to garner their support. He also continued to call Dr. Aguiluz throughout the evening, but Dr. Aguiluz did not answer his

phone. Dr. Aguiluz left another urgent voicemail with Dr. Kaulfus, seeking guidance on how to deal with the situation.

38. After hearing about Dr. Wang's tirade against Dr. Aguiluz in the OR, which was witnessed by multiple doctors and staff, Dr. Kaulfus instructed Dr. Aguiluz not to go to work the next few days.

39. On November 16, 2017, Dr. Kaulfus called Dr. Wang to direct him again not to call or contact Dr. Aguiluz. That afternoon, Dr. Wang called Dr. Bialowas and blamed her for inciting Dr. Aguiluz's Official Complaint.

40. On November 17, 2017, Dr. Kaulfus directed Dr. Aguiluz to meet with Dr. Ronald Stewart, the head of the surgery department, about the Official Complaint. Dr. Stewart assured Dr. Aguiluz he would not be retaliated against, but he chastised Dr. Aguiluz for allowing the "issue" to go outside of the department of surgery.

41. Dr. Aguiluz found Dr. Stewart's comment disconcerting, inasmuch as doctors and administrators in the department had known about Dr. Wang's harassment but had ignored it and taken no action to protect him. Moreover, Dr. Aguiluz had done nothing more than pursue his legal rights to be protected from a hostile education and work environment.

42. Later in the day on November 17, 2017, Dr. Aguiluz met with Dr. Shah, who told him that Dr. Stewart had assigned her to replace Dr. Wang as Dr. Aguiluz's Program Director. This decision was concerning to Dr. Aguiluz because Dr. Shah was not a board-certified plastic surgeon and he knew the change would impact his residency credentials. Moreover, Dr. Shah had a close professional relationship with Dr. Wang.

43.     Dr. Aguiluz told Dr. Shah that he was unhappy that she had been assigned to be his Program Director because she had witnessed Dr. Wang's harassment and had brushed it aside. Dr. Shah responded by saying "I am the best you got."

44.     In order to become board certified in plastic surgery, Dr. Aguiluz needed to meet a quota of surgical procedures under the supervision of a board-certified surgeon. Following her assignment as Dr. Aguiluz's substitute Program Director, Dr. Shah notified Dr. Aguiluz that he was prohibited from performing any future surgical procedures at University Hospital, the location of his residency. This prohibition forced Dr. Aguiluz to perform his surgical procedures exclusively at Methodist Hospital. This change was a major blow to Dr. Aguiluz as the procedures available to him at University Hospital were far more hands-on and intended to provide residents real working experience. Such irreplaceable opportunities should have formed the foundation of Dr. Aguiluz's resume, leading to respect among his physician peers and enviable employment opportunities. Instead, they will never be a part of Dr. Aguiluz's professional biography.

45.     Dr. Aguiluz was not only an exemplary student, he was also the Chief Administrative Resident in the Program. Having achieved this role, Dr. Aguiluz was in charge of crucial administrative scheduling matters for the residents at University Hospital. Because he was no longer permitted to do surgical procedures at University Hospital, however, the hospital administration discouraged Dr. Aguiluz from being present there. To avoid unnecessary tension, including run-ins with Dr. Wang, Dr. Aguiluz was forced to be discrete if he needed to be physically present at University Hospital.

46.     The inability to move freely about the hospital was extremely stressful and frustrating for Dr. Aguiluz. Eventually, he began doing everything he could remotely, and when he had to pick up mail or sign paperwork, he would ask an administrative assistant to bring it to

him in the parking lot. He also stopped attending therapy sessions, as his assigned therapist was in the same complex as the hospital. This banishment and isolation weighed heavily on his already deteriorating mental and emotional health.

47. On December 3, 2017, Dr. Shah informed Dr. Aguiluz that he could no longer attend Thursday afternoon educational conferences—again, a core educational component of the Program. The reason Dr. Shah gave for this unfair measure was that Dr. Wang needed to attend the lectures. UTHSC-SA's decision meant that if Dr. Aguiluz was to obtain the necessary lecture information, he would have to do so by watching the lectures from videotape. The effect of UTHSC-SA's decision was to cut Dr. Aguiluz off from the interactive educational and networking benefits of the lectures, including contact with his fellow residents and the speakers brought in for the lectures.

48. On January 11, 2018, Dr. Aguiluz met with Dr. Kaulfus to review the preliminary report of the Title IX investigation of his Official Complaint, which included interviews of Dr. Aguiluz, Dr. Wang, and nine other witnesses. At the meeting, Dr. Kaulfus told Dr. Aguiluz that Dr. Wang had violated UTHSC-SA's Sexual Harassment/Sexual Misconduct Policy.

49. In a letter dated February 2, 2018, UTHSC-SA formally notified Dr. Aguiluz that Dr. Wang had committed misconduct. Specifically, UTHSC-SA's Title IX Office found that the evidence supported a finding that Dr. Wang violated HOP 4.2.2, which refers to UTHSC-SA's Handbook of Operating Procedures, Sexual Harassment/Sexual Misconduct Policy.

50. The findings letter indicated that the matter was being referred to Dr. Stewart for disciplinary action against Dr. Wang and that Dr. Aguiluz would be informed as to what action would be taken against Dr. Wang. The letter also, curiously, indicated that all jurisdiction of the

matter, including the issue of interim measures, had been transferred to Dr. Stewart, who was the head of the surgery department and who had no affiliation with the Title IX Office.

51. In other words, the Title IX Office passed off the sole authority to determine disciplinary action and the continuance of interim measures to a colleague of Dr. Wang's with no Title IX training or affiliation.

52. Contrary to the findings letter, UTHSC-SA never notified Dr. Aguiluz of the outcome of Dr. Wang's disciplinary referral. Upon information and belief, Dr. Stewart chose not to discipline Dr. Wang. As far as Plaintiff knows, Dr. Wang suffered no consequences for his conduct in violation of the Sexual Harassment Policy. In addition, Dr. Stewart did not put any measures in place to protect Dr. Aguiluz from Dr. Wang's harassment and retaliation. In contrast to Dr. Wang's preferential treatment, Dr. Aguiluz continued to suffer the loss of educational privileges. For example, UTHSC-SA never modified its decision to banish Dr. Aguiluz from the Thursday lecture series or to prohibit him from the use of University Hospital surgical facilities.

53. UTHSC-SA also expressly excluded Dr. Aguiluz from the webpage of past graduates of the Program. The website is frequented by potential employers, medical partners, insurance companies, hospitals, patients, media, and others to confirm participation in the Program and to gain information about a physician's work. Inclusion in the website is an important part of any resident's curriculum vitae.

54. Dr. Aguiluz graduated from the Program in July 2018. Although he received an offer to join the Surgeon's prestigious practice upon graduation, Plaintiff did not believe he would have the backing of UTHSC-SA to handle cases at University Hospital, where Dr. Wang continued to exercise substantial control. Moreover, the prospect of attempting to become a successful plastic surgeon in San Antonio where Dr. Wang wielded so much influence was both daunting and

terrifying. Dr. Aguiluz ultimately made the difficult decision to leave San Antonio where a future medical practice was no longer a realistic opportunity.

55. Since leaving San Antonio, Dr. Aguiluz continues to suffer from Dr. Wang's inappropriate and retaliatory comments about him. For example, at a recent conference attended by plastic surgeons from around the country, Dr. Aguiluz learned quite by accident that Dr. Wang was continuing to bad-mouth him to others, including people who did not even know Dr. Aguiluz. This encounter caused the anxiety and depression that had plagued Dr. Aguiluz to resurge.

56. As a result of the actions of Dr. Wang and UTHSC-SA, Dr. Aguiluz has suffered significant emotional and pecuniary injury.

## IV.
## CLAIMS

### COUNT 1 – Title IX Violations

57. Dr. Aguiluz incorporates by reference each of the paragraphs recited above.

58. Defendant's actions and omissions constitute unlawful discrimination against Dr. Aguiluz in violation of his rights under Title IX to receive an education in an environment that is not sexually hostile. Among other actions, Defendant made Dr. Aguiluz vulnerable to an unsafe and discriminatory environment by the adoption and continuance of an official policy of condoning sexual harassment by high-ranking educators. These official policies unreasonably subjected Dr. Aguiluz to a heightened risk of sexual harassment and sex discrimination.

59. UTHSC-SA also violated Dr. Aguiluz's rights under Title IX because it had an official policy of failing to vest appropriate control and authority in its Title IX Office and failing to ensure that officials, representatives, or staff overseeing a Title IX investigation, or the implementation, continuance, or maintenance of interim measures, were adequately trained to do so. UTHSC-SA's decision to transfer Title IX authority to one individual in the surgery

department, Dr. Stewart, who had no affiliation with the Title IX Office was a complete abdication of its responsibilities under Title IX.

60.     Ultimately, neither the Title IX staff nor the surgery department were properly trained on the requirement under Title IX of non-retaliatory interim measures to protect victims of sexual harassment and sex discrimination. As a result, UTHSC-SA wholly failed to implement appropriate interim measures in this case; indeed, it implemented measures that actually were adverse to the complaining victim, whose Official Complaint was corroborated.

61.     UTHSC-SA further violated Dr. Aguiluz's rights under Title IX because officials and responsible authorities had actual knowledge that Dr. Aguiluz had been sexually harassed by Dr. Wang, but they responded with deliberate indifference and retaliation to this knowledge. UTHSC-SA's deliberate indifference and retaliation includes, but is not limited to, failing to implement effective interim measures and no contact orders to prevent confrontations between Dr. Aguiluz and Dr. Wang, the purposeful implementation of adverse interim measures against Dr. Aguiluz, and the blatant banishment of Dr. Aguiluz from core curriculum classes and from University Hospital.

62.     UTHSC-SA's deliberate indifference and inaction to stop retaliation by Dr. Wang and other officials of the surgery department and Program caused Dr. Aguiluz to undergo additional harassment and/or made Dr. Aguiluz vulnerable to further harassment and retaliation by these individuals.

63.     The sexual harassment and sex discrimination Dr. Aguiluz suffered at the hands of Dr. Wang, and later, the retaliation Dr. Aguiluz experienced, was so severe, pervasive, and objectively offensive in light of the circumstances, that it created a hostile educational environment

at UTHSC-SA that deprived Dr. Aguiluz of access to important educational opportunities and benefits he had a right to under Title IX.

64. Dr. Aguiluz is entitled to be made whole for all damage to him caused by UTHSC-SA's discrimination against him. He also seeks equitable relief necessary to return him to the position that he would have held absent UTHSC-SA's unlawful discrimination.

65. UTHSC-SA's discrimination caused Dr. Aguiluz to suffer, and he expects to continue to suffer, pecuniary losses, which include: costs for relocating away from San Antonio, medical and counseling costs, losses associated with being forced to accept less lucrative employment, and losses associated with lost employment opportunities overall.

66. As a further result of UTHSC-SA's discrimination, Dr. Aguiluz has suffered and continues to suffer compensatory damages and other non-pecuniary losses, including, among others: intense emotional pain relating to his sexual harassment and retaliation and UTHSC-SA's discriminatory treatment of him, undue stress, anxiety, anguish, loss of enjoyment of life, physical pain, and feelings of re-victimization by UTHSC-SA, as well as other non-pecuniary damages.

67. UTHSC-SA's discrimination required Dr. Aguiluz to retain the undersigned counsel in order to redress the harm done to him by UTHSC-SA. Consequently, Dr. Aguiluz seeks attorneys' fees. He also seeks to recover expert costs and other litigation expenses.

## **COUNT 2 – Sex Discrimination and Retaliation Under Title VII**

68. Dr. Aguiluz incorporates by reference each of the paragraphs recited above.

69. Dr. Aguiluz is an employee and Defendant is an employer within the meaning of Title VII. All conditions precedent to the filing of this action under Title VII have occurred.

70. Dr. Aguiluz was exposed to unwelcome sexual harassment as more fully described above that was severe, pervasive, and created an abusive working environment on account of

Dr. Aguiluz's gender, male, in that he did not carry himself in conformity with typical male stereotypes. UTHSC-SA took tangible employment actions against Dr. Aguiluz as a result of his Official Complaint that resulted in significant changes in his employment status.

71. Further, UTHSC-SA, through its officials, representatives, agents, and employees, failed to take effective corrective action regarding the sexual harassment even though Dr. Aguiluz properly reported the offensive conduct to officials charged with addressing such hostile work environment claims.

72. UTHSC-SA's actions are based on Dr. Aguiluz's perceived non-conformity with traditional gender stereotypes in that Dr. Aguiluz is an effeminate male who Dr. Wang and other UTHSC-SA employees and representatives believed had a physical appearance, including his hair style, which did not conform to their views of the way men should dress and carry themselves.

73. After Dr. Aguiluz made a protected Title VII report, UTHSC-SA retaliated against him by engaging in conduct that would cause similar employees not to report the offensive behavior, such as isolating him from his peers, forcing him to enter his workplace surreptitiously, barring him from professional events, giving him a substitute Program Director who was not board-certified, professionally challenging Dr. Aguiluz with defamatory claims that he had HIV, forcing him to perform operations and procedures at a less respected hospital than the one in which his peers were being trained, and deliberately excluding him from UTHSC-SA's webpage that publicly recognizes graduates of the Program.

74. Due to Defendant's actions, Dr. Aguiluz has suffered, and continues to suffer, damages including but not limited to lost wages and fringe benefits, both past and future, and compensatory damages in the form of the loss of employment opportunities, past and future emotional pain, suffering, inconvenience, mental anguish, and the loss of enjoyment of life, the

costs and expenses of seeking new employment, and damages for the harm caused to Dr. Aguiluz's reputation.

## V.
## JURY DEMAND

75. Dr. Aguiluz requests a jury trial on all issues, claims, actions, and defenses in this case.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CESAR AGUILUZ, D.O. prays that Defendant UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT SAN ANTONIO be summoned to appear and answer, and that on final trial, judgment be granted against Defendant for:

a. A declaration that Defendant's actions violated federal law;
b. Equitable relief necessary to place Dr. Aguiluz in the position that he would have held but for Defendant's discrimination and retaliation against him;
c. Actual and compensatory damages;
d. Prejudgment and post-judgment interest;
e. Attorneys' fees, expert fees, and costs of suit; and
f. Other legal and equitable relief to which Dr. Aguiluz may justly be entitled.

Dated:  November 20, 2019.

Respectfully submitted,

**FARROW-GILLESPIE HEATH WITTER, LLP**

By: */s/ Julie E. Heath*
   Julie E. Heath
   Texas Bar No. 09348050
   Patricia H. Davis
   Texas Bar No. 24036449
   1700 Pacific Avenue, Suite 3700
   Dallas, Texas 75201
   Tel: (214) 560-5600
   Fax: (214) 203-0651
   julie.heath@fghwlaw.com
   patricia.davis@fghwlaw.com

**ATTORNEYS FOR PLAINTIFF
CESAR AGUILUZ, D.O.**