IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CESAR AGUILUZ, D.O.; | § § § § | |
| *Plaintiff*, | § § | |
| vs. | § § | 5-19-CV-01356-FB-RBF |
| UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT SAN ANTONIO, | § § § § | |
| *Defendant*. | § § § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns the Second Amended Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendant University of Texas Health Science Center at San Antonio (UTHSCSA). *See* Dkt. No. 21. All pretrial matters in this action have been referred for resolution pursuant to Rules CV-72 and 1 of Appendix C to the Local Rules for the United States District Court for the Western District of Texas. *See* Dkt. No. 15. Authority to enter this recommendation stems from 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, the Motion, Dkt. No. 21, should be **DENIED**.

**Factual and Procedural Background**

The Court looks to the live complaint, in this procedural posture, to provide the relevant factual background, and the following recitation of facts reflects as much. The complaint explains that in 2015, Plaintiff Dr. Cesar Aguiluz entered a medical-residency program at

UTHSCSA to complete a three-year fellowship in plastic and reconstructive surgery. *See* 2nd Amend. Compl. (Dkt. No. 20) ¶ 9. The goal of the program was to provide the "best educational experience possible in the art and science of plastic surgery and produc[e] caring, competent, well-educated practitioners of plastic surgery who will contribute and advance the field of plastic surgery." *Id.* ¶ 10 (brackets altered). Graduates of the program typically are able to meet the basic requirements for board certification as set forth by the American Board of Plastic Surgery. *Id.* ¶ 9. In addition to the program's educational component, Dr. Aguiluz also served as a medical resident. *See id.* ¶ 10. At the time of his admission and throughout his fellowship, the program was overseen by program director Dr. Howard T. Wang. *See id.* ¶ 11.

Dr. Aguiluz alleges that almost immediately following his entrance into the program and continuing throughout 2017, Dr. Wang began sexually harassing him based on his status as a gay male who also didn't conform to typical male stereotypes. *See id.* ¶¶ 12-23, 79. Specifically, Dr. Aguiluz contends that Dr. Wang would (1) comment about Dr. Aguiluz's chest hair and mock Dr. Aguiluz about his hairstyle and appearance; (2) instruct Dr. Aguiluz to bend over for him and sit on his lap; and (3) wrongfully insinuate to Dr. Aguiluz, his colleagues, and UTHSCSA management that Dr. Aguiluz was HIV positive. *See id.* In addition, on at least one occasion, Dr. Wang asked Dr. Aguiluz to step into the bathroom with him while the two were discussing patient care and then proceeded to urinate in front of him, exposing his penis. *See id.* In essence, Dr. Aguiluz contends that Dr. Wang "engaged in some kind of inflammatory conduct virtually every time he was in [Dr. Aguiluz's] presence." *Id.* ¶ 23. The harassment, according to Dr. Aguiluz, "pervaded every aspect of [his] educational and work experience," causing him to suffer frequent anxiety attacks. *Id.* ¶ 22.

Dr. Aguiluz began making a concerted effort to rearrange his life at UTHSCSA to avoid coming into contact with Dr. Wang. *See id.* ¶ 22-23. But "[d]espite actively attempting to dodge encounters with Dr. Wang, Dr. Aguiluz was [still] forced to interact with him both in his coursework and in his residency training." *Id.* Eventually, Dr. Aguiluz's educational goal at UTHSCSA "shrank from obtaining the most positive, complete, and rich education available to merely graduating and moving on as quickly as possible." *Id.*.

Towards the end of 2017, Dr. Aguiluz decided he could no longer endure the harassment. Accordingly, at the suggestion of his clinical professor of plastic surgery, on November 6, 2017, Dr. Aguiluz met with Dr. Bonnie Blankmeyer—the Executive Director of the Academic, Faculty and Student Ombudsperson and ADA Compliance Office at UTHSCSA—to informally discuss reporting options. *See id.* ¶ 27. Dr. Blankmeyer in turn referred Dr. Aguiluz to Dr. Jacqueline Mok, the Vice President for Academic, Faculty and Student Affairs who oversaw Title VII employment issues. *See id.* On or about November 11, 2017, Dr. Aguiluz formally reported Dr. Wang via an email to Dr. Mok, requesting (initially) that his complaint remain anonymous for fear of retaliation. *See id.* ¶ 29. Ultimately, Dr. Mok forwarded Dr. Aguiluz's complaint to UTHSCSA's Title IX Office, concluding that it was the appropriate department to handle it. *See id.* ¶ 30. Dr. Kaulfus, UTHSCSA's Title IX Director, agreed with the decision and acknowledged the report on November 12, 2017. *See id.* ¶¶ 30-31. On November 14, 2017, Dr. Aguiluz made his "official Title IX complaint" directly to Dr. Kaulfus, again reiterating that he wanted his complaint to remain anonymous. *See id.* ¶ 32.

Shortly thereafter, Dr. Aguiluz advised Dr. Kaulfus that he no longer wanted his complaint to remain anonymous. *See id.* ¶ 34. Fearing retaliation, however, Dr. Aguiluz requested that UTHSCSA implement immediate interim measures to protect him from Dr. Wang.

*See id.* Specifically, Dr. Aguiluz requested that Dr. Wang be instructed to leave him alone and that the program assign him a new director. *See id.* Dr. Kaulfus in response promised Dr. Aguiluz that Dr. Wang wouldn't be permitted to contact him and similarly instructed Dr. Aguiluz to avoid Dr. Wang. *See id.*

The complaint alleges that Dr. Kaulfus wasn't able to honor his promise. The day after Dr. Aguiluz lodged his official complaint with UTHSCSA's Title IX Office, Dr. Wang—who had heard of Dr. Aguiluz's complaint—began calling and paging Dr. Aguiluz repeatedly. *See id.* ¶¶ 36-38. He then confronted Dr. Aguiluz during an evening surgery Dr. Aguiluz was scheduled to perform with another doctor. *See id.* ¶¶ 36-38. Ultimately, Dr. Wang's yelling forced Dr. Aguiluz to flee the operating room. *See id.* Later that night, Dr. Wang "continued to harass and intimidate Dr. Aguiluz by calling him throughout the evening." *Id.* ¶ 39. After learning about Dr. Wang's "tirade" against Dr. Aguiluz, Dr. Kaulfus instructed Dr. Aguiluz not to go to work the next few days. *See id.* ¶¶ 40-41. He then spoke with Dr. Wang and again instructed him not to call or otherwise contact Dr. Aguiluz. *See id.*

On November 17, 2017, Dr. Kaulfus directed Dr. Aguiluz to meet with Dr. Ronald Stewart— the head of UTHSCSA's surgery department who had no affiliation with UTHSCSA's Title IX office or Title IX training—regarding Dr. Aguiluz's complaint. *See id.* ¶¶ 45, 58-59. During this meeting Dr. Stewart provided the "standard representation" that Dr. Aguiluz wouldn't be retaliated against but Dr. Stewart also simultaneously chastised Dr. Aguiluz for permitting the "issue" to go outside the department of surgery. *See id.*

Following Dr. Stewart's involvement, Dr. Aguiluz was subjected to several actions he contends were retaliatory. First, Dr. Stewart assigned Dr. Shah as Dr. Aguiluz's program director. *See id.* ¶ 48. Dr. Shah, however, had a close professional relationship with Dr. Wang

and had previously "brushed aside" Dr. Wang's harassment of Dr. Aguiluz. She also wasn't a board-certified plastic surgeon. *See id.* ¶¶ 48-49. Having a non-board certified surgeon as a program director made it "impossible" for Dr. Aguiluz to qualify for board certification upon graduation. *See id.* In contrast, according to Dr. Aguiluz, there were at least six other surgeons who were board-certified and could've been named his program director. *See id.*

Shortly after her assignment as Dr. Aguiluz's program director, Dr. Shah informed Dr. Aguiluz that he was prohibited from performing any future surgical procedures at University Hospital—the location of his residency. *See id.* ¶ 50. This prohibition forced Dr. Aguiluz to perform surgical procedures exclusively at Methodist Hospital. This "detrimentally impacted Dr. Aguiluz's educational opportunities" because procedures available at University Hospital were "far more hands-on and intended to provide residents real working experience treating a variety of patients" than were the procedures at Methodist Hospital. *See id.* In addition, because Dr. Aguiluz was banned from performing surgical procedures at University Hospital, hospital administration discouraged his presence at University Hospital. This made it difficult for Dr. Aguiluz to perform his role as the Chief Administrative Resident of the program, causing Dr. Aguiluz stress and frustration. *See id.* ¶¶ 51-52.

Then, on December 3, 2017, Dr. Shah informed Dr. Aguiluz that he could no longer attend the program's Thursday afternoon educational conferences, which were a "core and required" educational component of the program. *See id.* ¶ 53. Instead, from early December 2017 until the time he graduated in July 2018, Dr. Aguiluz was required to remotely watch the lectures. *See id.* ¶ 55. Although Dr. Shah explained that the reason for this measure was that Dr. Wang needed to attend the lectures, Dr. Wang was rarely in attendance. *See id.* ¶¶ 54-55. This decision, Dr. Aguiluz alleges, not only humiliated him in front of his fellow residents but also

served to cut Dr. Aguiluz off from the "interactive and networking benefits" of the lectures. *Id*. Specifically, Dr. Aguiluz claims he was deprived of the ability to take part in presentations and discussions of case studies and scholarly articles. *See id.*

On February 2, 2018, UTHSCSA's Title IX office notified Dr. Aguiluz that after conducting its investigation— which included interviews of Dr. Aguiluz, Dr. Wang, and nine other witnesses—it concluded that Dr. Wang had violated UTHSCSA's sexual harassment/sexual misconduct policy. *See id.* ¶¶ 56-57. But, ultimately, UTHSCSA's Title IX office took no action against Dr. Wang. *See id.* ¶ 58. Instead, the office transferred the matter of disciplining Dr. Wang as well as the continuance of interim protective measures to Dr. Stewart. *See id*. As far as Dr. Aguiluz is aware, to date, Dr. Wang has suffered no consequences as a result of his alleged misconduct. *See id.* ¶ 60. In contrast, Dr. Aguiluz claims he "suffered the loss of educational and employment privileges as a result of his complaint." *Id.* ¶ 61.

Dr. Aguiluz graduated from UTHSCSA's program in July 2018. *See id.* ¶ 62. Upon graduation, Dr. Aguiluz received an offer to join a prestigious plastic surgery practice owned by one of his professors. *See id.* ¶ 63. Ultimately, however, Dr. Aguiluz declined the officer for fear that "he would not have the backing of UTHSC-SA to handle cases at University Hospital where Dr. Wang exercised substantial control." *Id.* Accordingly, Dr. Aguiluz "made the difficult decision to leave San Antonio where a medical practice was no longer a realistic opportunity for him." *Id.*

In the fall of 2018, UTHSCSA updated its website to include past graduates of the program. *See id.* ¶ 62. In doing so, Dr. Aguiluz contends, UTHSCSA intentionally excluded him from the list of program participants. *See id.* This exclusion, according to Dr. Aguiluz, was extremely detrimental to his career because the website is often frequented by potential

employers, medical partners, insurance companies, hospitals, patients, media, and others to confirm participation in the program and to gain information about a physician's work. *See id.*

On October 25, 2018, Dr. Aguiluz filed a charge of discrimination against UTHSCSA alleging that it committed sex discrimination and retaliation in violation of Title VII. *See id.* ¶ 6; *see also* Dkt. 21-1. On November 20, 2019, Dr. Aguiluz sued UTHSCSA. *See* Dkt. No. 1.[1]

In his live complaint, Dr. Aguiluz raises claims against UTHSCSA for (1) unlawful discrimination and retaliation in violation of Title IX; and (2) retaliation in violation of Title VII. *See* 2nd Amend. Compl. UTHSCSA now moves to dismiss Dr. Aguiluz's claims.[2] *See* Dkt. No. 21.

### Standard of Review

Before turning to the merits of UTHSCSA's motion, the Court will briefly address the appropriate standard of review. UTHSCSA moves to dismiss Dr. Aguiluz's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). But the majority of UTHSCSA's Motion calls into question the sufficiency of Dr. Aguiluz's pleadings, and UTHSCSA concedes that Rule 12(b)(6) "provides the proper procedural vehicle for analyzing [its] federal-preemption defense." Mot. at 6 n.1 (citing *Fisher v. Halliburton*, 667 F.3d 602, 608-09 (5th Cir. 2012)). Accordingly, the Court will analyze UTHSCSA's motion under the rubric of Rule 12(b)(6).

---

[1] Although Dr. Aguiluz received the EEOC's Notice of Right to Sue on May 28, 2019, the parties entered into a tolling agreement with an expiration date of November 22, 2019. *See* 2nd Amend. Compl. ¶ 7. Accordingly, there's no dispute here that Dr. Aguiluz timely instituted this action.

[2] In addition to moving to dismiss Dr. Aguiluz's live claims, UTHSCSA seeks to dismiss Dr. Aguiluz's hostile work environment claim. This claim, however, isn't raised in Dr. Aguiluz's live complaint and so these arguments (including UTHSCSA's assertion—reiterated in its reply— that Dr. Aguiluz's Title VII sexual harassment claim is time barred) need not be addressed. *See* 2nd Amend. Compl.; *see also* Resp. (Dkt. No. 22) at 2 n. 1 (conceding that Dr. Aguiluz "no longer brings Title VII hostile work environment claims").

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Although a complaint "does not need detailed factual allegations," the "allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations pleaded must show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

In reviewing a motion to dismiss under Rule 12(b)(6), a court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Const. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quotation marks omitted). A court, however, need not credit conclusory allegations or allegations that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678).

The court's review of a motion to dismiss is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are "central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The district court may also take judicial notice of matters of public record. *See Norris v. Hearst Trust*, 500 F.3d 454, 461 n. 9 (5th Cir. 2007). In this case, UTHSCSA has attached to its motion a copy of Dr. Aguiluz's charge of discrimination along with Aguiluz's November 13, 2017, internal complaint to UTHSCSA's Title IX coordinator, Dr. Kaulfus. *See* Dkt. No. 21-22. These documents are central to Dr. Aguiluz's

claims and are referred to in the Complaint. They could be appropriately considered when evaluating the merits of UTHSCSA's motion. But there's no need to consider them here and considering them wouldn't alter the Court's analysis. UTHSCSA attached them in support of its argument that Dr. Aguiluz failed to timely file his charge of sexual harassment with the EEOC. But as mentioned, Dr. Aguiluz is no longer suing for sexual harassment, *see supra* n.1, and so, these documents aren't relevant to the issues presented.

**Analysis**

Dr. Aguiluz has pled plausible claims for violations of both Titles IX and VII. Accordingly, the motion should be denied.

*Title VII Preemption*. UTHSCSA has not demonstrated that Dr. Aguiluz's Title IX claims are preempted or barred under *Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995). *Lakoski* held that for a professor employed by a federally funded educational institution, "Title VII provide[d] the exclusive remedy for [ ] alleging employment discrimination on the basis of sex." *Id*. at 753. The case at bar involves a medical resident connected to the educational institution in part as an employee but also in part as a recipient of educational services. Accepting Dr. Aguiluz's well-pleaded facts as true, UTHSCSA's residency program appears to have features reflecting that its mission is in part sufficiently educational so as to implicate Title IX. This case, in other words, is not controlled by *Lakoski* because it presents a very different factual scenario.

Moreover, Dr. Aguiluz alleges facts suggesting UTHSCSA's actions denied him important benefits of his educational program. For example, he alleges that UTHSCSA denied him the opportunity to (1) participate in weekly conferences, which served a "core" educational component of the residency program; (2) perform more hands-on procedures at University Hospital, which would've "formed the foundation of Dr. Aguiluz's education as a surgeon"; and

9

(3) become board certified upon graduation. In other words, Dr. Aguiluz has identified harms beyond what Title VII can remedy, and UTHSCSA offers no compelling argument to suggest otherwise. *See Prairie View*, No. 4:17–CV–1957, 2018 WL 1947804, at *4 (S.D. Tex. Apr. 25, 2018) (distinguishing *Lakoski* where an employment discrimination claim under either statute "would yield essentially the same remedy for essentially the same harm").

Finally, "critical" to the Court's holding in *Lakoski* was the fact that, despite possessing a colorable claim of employment discrimination, the professor-plaintiff chose to circumvent Title VII's administrative requirements and pursue a traditional employment discrimination claim under the guise of Title IX. *See id.* In contrast, Dr. Aguiluz filed a charge of discrimination and retaliation with the EEOC and obtained a Right to Sue letter. Although UTHSCSA contends that Dr. Aguiluz's (now abandoned) Title VII hostile work environment claim is time barred, unlike *Lakoski*, this isn't a situation where Dr. Aguiluz wholly attempted to bypass Title VII's remedial process.

Most notably, UTHSCSA hasn't cited any case holding that Title VII preempts or bars a Title IX action for sex discrimination asserted by a plaintiff who is *both* a student and an employee of a federally funded educational program. Based on the briefing submitted, the Court declines to terminate Dr. Aguiluz's Title IX claims at this early stage in the proceedings. *See, e.g.*, *Morrison v. Univ. of Miami*, No. 1:15-CV-23856-UU, 2016 WL 3129490, at *5 (S.D. Fla. Jan. 20, 2016) (refusing to find Title IX claims of PhD student who was also employed as a resident assistant preempted by Title VII based upon the "lack of controlling authority" cited by the defendant).

*Title IX Discrimination.* There are two avenues for stating a Title IX claim. First, a plaintiff can allege there was an official policy of sex discrimination. *See Gebser v. Lago Vista*

*Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Ultimately, this approach "requires proof of the existence of a discriminatory policy or custom in much the same way that a § 1983 plaintiff demonstrates the liability of a municipality under the *Monell* line of cases." *Doe 1 v. Baylor Univ.*, 335 F.R.D. 476, 489-90 (W.D. Tex. 2020). At the pleadings stage, a plaintiff must identify a specific policy or custom that allegedly inflicted the injury in question. *See Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 690-91 (1978). Second, a plaintiff can allege a Title IX violation where an "appropriate person" had "actual knowledge of the discrimination" and responded with "deliberate indifference." *Gebser*, 524 U.S. at 290. A funding recipient's response to known acts of discrimination is deliberately indifferent when it is "clearly unreasonable in light of the known circumstances." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 648 (1999). Dr. Aguiluz pursues a claim under both theories.

First, Dr. Aguiluz argues that UTHSCSA subjected him to a "heightened risk" that he would be subjected to sexual harassment in violation of Title IX by maintaining an official policy of: (1) "condoning sexual harassment by high-ranking educators"; (2) "failing to vest appropriate control and authority in its Title IX Office, which led the Title IX office to refer disciplinary measures against Dr. Wang to the head of the surgery department instead of addressing the conduct itself"; and (3) "failing to ensure that officials, representatives, or staff overseeing a Title IX investigation, or the implementation, continuance, or maintenance of interim measures were adequately trained to do so." Dkt. No. 22 at 9 (citing 2nd Amend. Compl. ¶¶ 8, 45-46, 58-60, 67-68). The Fifth Circuit, however, has declined to adopt a Title IX theory of liability based on a general "heightened risk" of sex discrimination, especially where the case doesn't involve a student-on-student assault. *See Poloceno v. Dallas Indep. Sch. Dist.*, 826 F.

App'x 359, 363 (5th Cir. 2020). Dr. Aguiluz's official-policy theory of Title IX liability, therefore, faces a challenge.

Moreover, Dr. Aguiluz doesn't appear to have pled facts readily capable of explaining how any of the foregoing alleged policies *caused* Dr. Wang's harassment. Dr. Aguiluz also hasn't pled that UTHSCSA deliberately or consciously chose not to train or supervise its Title IX staff despite being on notice that it needed to do so. *See In re Foust*, 310 F.3d 849, 862 (5th Cir. 2002) (discussing the standard for pleading when failure-to-train rises to the level of a policy in the context of a § 1983 action); *Rhyne v. Henderson Cty.*, 973 F.2d 386, 392 (5th Cir. 1992) (discussing when inaction rises to the level of a policy). But these shortcomings don't warrant dismissal at this early juncture, partly because they involve matters that could be fleshed out later in the case and partly because Dr. Aguiluz's other Title IX liability theory is viable and involves essentially the same predicate facts and alleged legal injuries.

With respect to deliberate indifference, Dr. Aguiluz has plausibly pled that UTHSCSA was deliberately indifferent to his reports of sex discrimination. According to Dr. Aguiluz, in response to his reports of sexual harassment, UTHSCSA subjected him—the victim—to various unfair interim measures, including prohibiting him from participating in the program's weekly conferences and performing surgeries at University Hospital. These unfair interim measures continued even after UTHSCSA ultimately determined that Dr. Wang committed sexual harassment in violation of university policy. In contrast, UTHSCSA officials only instructed Dr. Wang not to contact Dr. Aguiluz or harass him—an instruction Dr. Wang, it is alleged, ignored on several occasions. Dr. Aguiluz also pleads that Dr. Wang "suffered no consequences for his conduct." 2nd Amend. Compl. ¶ 60. UTHSCSA's alleged refusal to take reasonable remedial measures, according to Dr. Aguiluz, caused him to live in "constant fear" that he would be

subjected to further harassment, inhibiting his educational opportunities. *Id.* ¶¶ 23, 55. Accordingly, Dr. Aguiluz contends that UTHSCSA's unreasonable response made him vulnerable to future instances of harassment by Dr. Wang.[3]

Where a plaintiff raises a teacher-on-student discrimination and a defendant had actual notice of the alleged harassment, as is the case here, courts are in disagreement regarding whether the plaintiff must also prove that the harassment was severe or pervasive before subjecting the defendant to liability. *See Matthews v. Nwankwo*, 36 F. Supp. 3d 718, 723 (N.D. Miss. 2014) (collecting authorities). UTHSCSA cites no binding authority requiring such a showing. Dismissal on this basis is therefore not warranted. Regardless, Dr. Aguiluz's allegations would seem to satisfy this standard. He alleges that the harassment "occur[ed] in some form almost every time Dr. Aguiluz was in Dr. Wang's presence" for months on end and "pervaded every aspect of [Dr. Aguiluz's] educational and work experience." 2nd Amend. Compl. ¶¶ 12, 23.

In recommending that Dr. Aguiluz's Title IX discrimination claim survive UTHSCSA's motion to dismiss, the Court recognizes that deliberate indifference is a "tall hurdle." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 586 (5th Cir. 2020). Moreover, it appears that UTHSCSA provided Dr. Aguilar with the interim measures he specifically requested—Dr. Kaulfus instructed Dr. Wang to leave Dr. Aguiluz alone and he was ultimately provided a new program

---

[3] *See Davis*, 526 U.S. at 630 (a funding recipient who doesn't directly engage in harassment may be liable for damages if its deliberate indifference "subjects its students to harassment" *i.e.*, "causes students to undergo harassment or makes them liable or vulnerable to it") (quotations and brackets omitted); *Hernandez v. Baylor Univ.*, 274 F.Supp.3d 602, 613 (W.D. Tex. 2017) (noting the "discriminatory harm can include the harm faced by student-victims who are rendered vulnerable to future harassment and either leave school or remain at school and endure an educational environment that constantly exposes them to a potential encounter with their harasser or assailant").

director. Nevertheless, whether or not UTHSCSA acted with deliberate indifference in this case is better addressed after the record is more fully developed, as are other issues addressed above.

*Titles IX and Title VII Retaliation.* Finally, Dr. Aguiluz has pled plausible claims of both Title IX and Title VII retaliation.

A plaintiff alleging a Title VII retaliation claim must plead that (1) he engaged in activity protected by Title VII, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action." *Long v. Eastfield Coll*., 88 F.3d 300, 304 (5th Cir. 1996). Title IX retaliation claims are analyzed under the same standards as Title VII, although there is some dispute regarding whether the burden-shifting framework applies on summary judgment. *See Minnis v. Bd. of Sup'rs of La. State Univ. & Agr. & Mech. Coll*., 620 F. App'x 215, 222 (5th Cir. 2015). UTHSCSA doesn't meaningfully dispute that Dr. Aguiluz engaged in protected activity. It argues primarily that Dr. Aguiluz didn't suffer any adverse actions—Dr. Aguiluz didn't suffer a job loss, suspension, salary reduction, reduction of job duties, or any form of disciplinary action. It also argues a lack of a causal connection between any protected activity and alleged retaliation. Accordingly, UTHSCSA argues that Dr. Aguiluz "speculative" and "conclusory" allegations fail to satisfy Rule 8(a). UTHSCSA's arguments aren't persuasive.

Dr. Aguiluz pleads that shortly after complaining of Dr. Wang's alleged sexual harassment, UTHSCSA denied him the opportunity to participate in weekly conferences, which served a "core" educational component of its residency program. He further alleges UTHSCSA denied him the opportunity to perform more hands-on procedures at University Hospital, which would've "formed the foundation of Dr. Aguiluz's education as a surgeon." It also assigned him a non-board certified program director, which in turn prevented Dr. Aguiluz from becoming

board certified upon graduation. These actions plausibly would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted); *see also Alvarado v. Texas Rangers*, 492 F.3d 605, 613 (5th Cir. 2007) (explaining that "to be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement") (quotations and brackets omitted). Finally, the close timing between these actions and Dr. Aguiluz's complaints is sufficient to satisfy the requisite causal connection for present purposes. *See Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). Nothing more is required by Rules 8(a) and 12(b)(6).

## Conclusion and Recommendation

For the reasons discussed above, it is recommended that Defendant UTHSCSA's Motion to Dismiss, Dkt. No. 21, should be **DENIED**.

Pursuant to the Court's July 24, 2020 Order, within 14 days of the filing of Aguiluz's Second Amended Complaint, the parties were to confer and file joint scheduling recommendations to govern this action. *See* Dkt. No. 19. To date, however, the parties have failed to do so.

**IT IS THEREFORE ORDERED THAT within seven (7) days** from the date of this Order the parties shall confer and submit the aforementioned scheduling recommendations or show cause why they each should not be sanctioned.

## Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as

a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The objecting party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

    **IT IS SO ORDERED**.

    SIGNED this 15th day of January, 2021.

    RICHARD B. FARRER
    UNITED STATES MAGISTRATE JUDGE